```
                                                           U.S. DISTRICT COURT
                                                         DISTRICT OF VERMONT
                                                                FILED
```

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

2025 AUG 20 PM 1:41

CLERK

BY    *CDC*

DEPUTY CLERK

------------------------------- X
DEVON KURTZ,        :
                    :     Case No.: 2:25-cv-711
    *Plaintiff,*    :
                    :     COMPLAINT FOR
    v.              :     DECLARATORY AND
                    :     INJUNCTIVE RELIEF
JON MURAD, in his official capacity, DAVID BOVAT, :
in his official capacity, and ANTHONY GIORDANO, in :     JURY TRIAL DEMANDED
his official capacity, :
                    :
    *Defendants.*   :
                    :
------------------------------- X

Plaintiff Devon Kurtz ("Mr. Kurtz"), by and through his attorneys, against Defendants Jon Murad, in his official capacity as the Interim Commissioner of the Vermont Department of Corrections ("VT DOC"), David A. Bovat, in his official capacity as the acting Superintendent of the Southern State Correctional Facility ("SSCF"), and Anthony Giordano, in his official capacity as the Volunteer Services Coordinator at SSCF (collectively, "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

This action arises from Defendants' retaliatory termination of Quaker minister Plaintiff Devon Kurtz after he helped published a book of drawings, poetry, and personal literature by prison inmates at SSCF. The book, *Sketches from Behind Prison Walls* ("*Sketches*"), is both an expression of Mr. Kurtz's sincerely held Quaker religious beliefs, and art aimed at humanizing just a small handful of the millions of individuals incarcerated nationwide. "Uncomfortably honest" by its own description, *Sketches* critiques the American criminal legal system and mass incarceration, sharing prisoners' stories of medical neglect, isolation, cell overcrowding, and

1

surveillance alongside their reflections on religious, political, and moral reckoning. By pairing personal writings and drawings with Mr. Kurtz's literary and artistic analyses, *Sketches* embodies the Quaker ethic of dignity and justice for all people and provides its incarcerated contributors the rare opportunity to advocate for themselves. At the same time, the book is an expression of Mr. Kurtz's Quaker faith, from his nuanced opposition to the degrading conditions of modern criminal confinement to his reflections on God, service, and the resilience of the human spirit.

The Framers crafted the First Amendment to the United States Constitution to protect precisely the kind of governmental critiques and religious expression for which Mr. Kurtz is now being punished. Defendants fired Mr. Kurtz for obvious—but unconstitutional—reasons: Defendants disliked the way that *Sketches* humanized SSCF prisoners, criticized prisoners' mistreatment at the hands of prison officials, and expressed Mr. Kurtz's view that modern mass incarceration is incompatible with basic human dignity. By firing Mr. Kurtz for publishing *Sketches*, Defendants have stripped Mr. Kurtz of his right to speak freely on matters of public concern without government sanction. Defendants have likewise infringed upon Mr. Kurtz's ability to exercise his religion through his writing in *Sketches*. Devon Kurtz now brings this action to vindicate his First Amendment rights to freely practice his religion and to speak on a topic of paramount public importance.

## NATURE OF THE ACTION

Mr. Kurtz first began working at VT DOC in 2021 as an ordinary volunteer. Over time, as his Quaker faith deepened, his commitment to volunteering at the prison took new shape and he became a religious services volunteer. In that role, he served many incarcerated men but forged a special relationship with one Friend (the Quaker term for one of the religion's adherents), Rein Kolts. Mr. Kurtz felt that Mr. Kolts embodied Quaker values, not least of all through his art—

sketches of his fellow prisoners. The collection of sketches, Mr. Kurtz realized, could catalyze important conversations about incarcerated people's value and worth, "difficult truths about our society and its injustices," and the criminal legal system at large. From that realization, and the combined efforts of Mr. Kolts, other incarcerated men who contributed their writings, and the Quaker Institute for the Future ("QIF"), *Sketches* was published in spring 2024.

Although Mr. Kurtz did not initially receive any complaints about *Sketches* from Defendants or other VT DOC employees, Defendants wrongfully terminated Mr. Kurtz shortly after the book's publication and after over three years of dedicated, weekly volunteering. By firing Mr. Kurtz for his role in publishing *Sketches*—a creative work themed around one of the most prominent political issues of our time, mass incarceration—VT DOC violated Mr. Kurtz's First Amendment free speech and free exercise rights.

Despite Defendants' unlawful conduct, Mr. Kurtz attempted to resolve these issues in good faith so as to avoid litigation. After VT DOC stated that it was "not inclined to respond" to his request to be reinstated as a volunteer Quaker minister, Mr. Kurtz was left with no other choice but to file this action to vindicate his First Amendment rights. In bringing this action, Mr. Kurtz seeks declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and costs and attorneys' fees pursuant to 42 U.S.C. § 1988, together with such other and further relief as the Court may deem just and equitable.

## PARTIES

1.    Prior to his termination, Plaintiff Devon Kurtz served as a volunteer Quaker minister at SSCF in Springfield, Vermont.

2.    Defendant Jon Murad is the Interim Commissioner of the Vermont Department of Corrections. He is an employee of the State of Vermont. In his role, he is responsible for VT

3

DOC's administration and operation, including, but not limited to, hiring, firing, promotion, and discipline of employees.

3. Defendant David A. Bovat is the acting Superintendent of SSCF. He is an employee of the State of Vermont. Until recently, and during all times relevant to this action, Defendant Bovat was the Assistant Superintendent of SSCF; in that role, he was responsible for SSCF's administration and operation, including, but not limited to, hiring, firing, promotion, and discipline of employees, including volunteers. Defendant Bovat was directly involved in terminating Mr. Kurtz and signed Mr. Kurtz's official termination letter. A true and correct copy of Mr. Kurtz's termination letter ("Termination Letter") is attached as **Exhibit A**.

4. Defendant Anthony Giordano is the Volunteer Services Coordinator for SSCF. He is an employee of the State of Vermont. In his role, he was responsible for supervising Mr. Kurtz, including, but not limited to, hiring, firing, and disciplining Mr. Kurtz. Defendant Giordano called Mr. Kurtz to inform him of his termination.

## JURISDICTION AND VENUE

5. Plaintiff brings this Action pursuant to 42 U.S.C. § 1983 for violation of civil rights under the First Amendment of the United States Constitution.

6. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively; by Rules 57 and 65 of the Federal Rules of Civil Procedure, respectively; and by the general legal and equitable powers of this Court.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)-(2).

8. Defendants, officers of the U.S. government sued in their official capacity, are residents of, and serve as officials within, this District.

9. All of the events or omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

**A.  Mr. Kurtz Begins Working at Vermont Department of Corrections.**

10. In October 2020, Mr. Kurtz began training with VT DOC's Volunteer Services staff ("Volunteer Services") to work at SSCF as a Hartford Community Restorative Justice Center volunteer.

11. As part of the onboarding process, Mr. Kurtz received a set of training materials, including the VT DOC Contracted and Volunteer Staff Facility Site Security Training Manual ("Training Manual"). A true and correct copy of the Training Manual is attached as **Exhibit B**.

12. The Training Manual details ten policies "directly related to volunteer services." The Training Manual also lays out the Work Rules for VT DOC, which govern VT DOC employees and volunteers alike.

13. On October 27, 2020, Mr. Kurtz signed the Training Manual and other training materials and sent them to Volunteer Services via email, acknowledging that he had read and understood the materials. A true and correct copy of Mr. Kurtz's signed Training Manual is attached as **Exhibit C**.

14. In January 2021, Mr. Kurtz began working at SSCF under the supervision of Defendant Giordano.

15. VT DOC regularly provides volunteers with updated training and manuals. Mr. Kurtz received an updated Volunteer Orientation and Training Manual ("Updated Training Manual") after beginning his work at SSCF in January 2021. A true and correct copy of the Updated Training Manual is attached as **Exhibit D**.

5

16. The Updated Training Manual includes eleven policies "directly related to volunteer services." *See id.*

17. The Updated Training Manual clarifies that VT DOC volunteers are subject to the same rules as typical VT DOC employees: "As a staff member ([a] correctional employee, contractor, or other person providing services to Corrections Involved Individual's on behalf of the Department of Corrections) you are required to follow these Department Work Rules at all times." *Id.* at 2.

**B.    Mr. Kurtz Transitions to Working as a Quaker Volunteer.**

18. In February 2023, two years after beginning his work with VT DOC, Mr. Kurtz learned that Quaker ministry services had not been offered at SSCF in nearly two decades and thus began working as a religious services volunteer.

19. Mr. Kurtz belongs to the Religious Society of Friends, commonly known as the Quakers.

20. Communing with marginalized people and advancing social justice causes, including by serving prison communities, is a central facet of Quakerism and is a central tenet of Mr. Kurtz's religious beliefs as a Quaker. *See Quaker Institute for the Future*, https://quakerinstitute.org/about/ ("The mission of QIF is to advance a global future of inclusion, social and economic justice, and ecological well-being through participatory research and discernment.").

21. Speaking to others about Quakerism and promoting the Quaker faith—including through publication of books on these topics—is an essential aspect of Mr. Kurtz's religious practice.

22.     The act of promoting Quakerism to others as a way to address wrongdoing and injustice is also a central facet of Quakerism and is one of Mr. Kurtz's Quaker beliefs.

23.     Finally, advocacy on behalf of and service with prison communities has been a central belief of Quakers, dating back to the inception of Quakerism in the seventeenth century. *See Quakers in the World*, Quakers in Action, https://www.quakersintheworld.org/quakers-in-action/43/Reformers-in-Criminal-Justice ("Many Quakers have worked for reform of the criminal justice systems of their day. Quakers believe that people can always change: their focus has been on reforms that make positive change more likely, such as increased opportunities for education, improved prison conditions, help with facing up to violent impulses, and much else. Nowadays, restorative justice approaches are a central focus.").

24.     Rashid Darden of the Friends General Conference wrote about this central belief of Quakerism recently, explaining: "[M]any Quakers have worked in the prison system as officials, governors, pastors, or chaplains. When they had the power to, many [Quakers] changed things from within the prison system . . . The challenges faced by the modern American prison system can be addressed [by Quakers] through a renewed focus on rehabilitation and restoration . . . Through practical and compassionate efforts, it is possible [for Quakers] to work towards a more effective and humane justice system." Rashid Darden, *Reforming the Modern Prison System with Quaker Values in Mind*, Friends General Conference (Jan. 30, 2024), https://www.fgcquaker.org/2024/01/30/reforming-the-modern-prison-system-with-quaker-values-in-mind/.

C.      **Mr. Kurtz Prepares and Publishes *Sketches*.**

25.     Shortly after beginning SSCF's Quaker ministry, Mr. Rein Kolts, one of the incarcerated men at SSCF who attended Mr. Kurtz's weekly Quaker meetings, approached Mr. Kurtz with a collection of sketches and writings.

7

26. Mr. Kurtz learned that Mr. Kolts had been sketching other inmates for years and asking his subjects to pen journal entries to accompany the sketches. Mr. Kolts told Mr. Kurtz that the process was aimed at bringing joy to his fellow inmates and giving their present lives a sense of meaning.

27. Mr. Kurtz realized that the sketches and writings, if compiled and published, could provide the public with a more compassionate and nuanced view of incarcerated people and challenge the traditional good-versus-evil narrative surrounding the American criminal legal system.

28. Mr. Kurtz and Mr. Kolts' project of creating *Sketches from Behind Prison Walls* was born out of these strongly held beliefs. A true and correct copy of *Sketches* is attached as **Exhibit E**.

29. As the project's curator, Mr. Kurtz organized the contents into chapters and wrote a preface, introduction, commentaries, and afterword. *See id.*

30. In the book's Introduction, Mr. Kurtz writes that *Sketches* is "an uncomfortably honest interpretation of what it means to be an American in the age of mass incarceration" and that the book was intended to "confront the disinterest and disdain of the public towards incarcerated people." *See id.*

31. *Sketches'* pairing of artworks and writings covers themes including the "indignities of incarceration," "loss and connection during incarceration," and "existential questions of God, sin, and death." *See id.*

32. Mr. Kurtz's work on the book and its subsequent publication is a reflection of his views on mass incarceration and an expression of his Quaker faith.

33. Mr. Kurtz did not interview any incarcerated individuals for *Sketches*. Instead, those who contributed to the book proactively and voluntarily authorized the use of their writings for inclusion alongside Mr. Kolts' sketches of them.

34. Mr. Kurtz did not take photographs or make audio or video recordings of the incarcerated men featured in *Sketches*, and no such material is published in the book.

35. To facilitate his work on the book, Mr. Kurtz regularly sent pages of the *Sketches* manuscript to Mr. Kolts through the Getting Out app, which facilitates communication between prisoners and non-incarcerated people.

36. On information and belief, every message Mr. Kurtz sent through the Getting Out app with the *Sketches* manuscript attached was reviewed by a VT DOC employee before being transmitted to Mr. Kolts. As stated in the DOC Inmate Mail, Publications, and Audio Video Regulations Directive ("Mail Directive"), all "[i]tems contained in incoming mail . . . will be reviewed before allowing an inmate to take possession of them." A true and correct copy of the Mail Directive is attached as **Exhibit F**.

37. Upon information and belief, Defendants were aware of the communications between Mr. Kurtz and Mr. Kolts, including seeing drafts and other communications about the book and did not object to those communications or the idea behind *Sketches*.

38. *Sketches* was published by The Quaker Institute for the Future, on April 20, 2024, to "honor[] divine spirit" and spotlight the consequences of mass incarceration. *See* Ex. E. The Quaker Institute for the Future "seeks to generate insight, knowledge and wisdom that informs public policy and enables us to treat all humans and the whole commonwealth of life as a sacred community"; this includes publishing books like *Sketches*. *See Quaker Institute for the Future*, https://quakerinstitute.org/.

39. Shortly after publication, Mr. Kurtz brought several copies of *Sketches* to SSCF. VT DOC security examined these copies when Mr. Kurtz entered the prison, as is customary for any outside materials entering the prison.

40. Mr. Kurtz gave one copy of *Sketches* to Defendant Giordano, who was Mr. Kurtz's direct supervisor.

41. On May 3, 2024, the VAULT, an art gallery in Springfield, Vermont, hosted an opening reception for its new exhibit, "Faces of Mass Incarceration." This exhibit featured a curated display of Kolts' sketches and the incarcerated men's writings, as published in *Sketches*. A true and correct copy of an email containing the press release for the event is attached as **Exhibit G**.

42. Over fifty people attended the "Faces of Mass Incarceration" event, including a Correctional Educator at the VT DOC Community High School of Vermont; the Windsor County State's Attorney; a Victim Advocate at the Windsor County State's Attorney Office; and multiple Vermont politicians, journalists, and community members.

43. At no time did any of Mr. Kurtz's supervisors or any of the named Defendants object to the content or publication of the book prior to its publication.

**D.   Mr. Kurtz Is Terminated for His Work on *Sketches*.**

44. On July 9, 2024, shortly after the publication of *Sketches*—and despite the fact that *Sketches* was seemingly well-received by the community at-large—Mr. Kurtz received an email from VT DOC Director of Victim Services Meredith Pelkey stating that it had "come to [Victim Services'] attention that [Mr. Kurtz] recently wrote a book." She requested to speak to Mr. Kurtz, to which he agreed but received no further reply establishing a time to talk.

45. Later that same day, Defendant Giordano called Mr. Kurtz and notified him that he was being terminated because of his work on *Sketches*.

46. Subsequently, Mr. Kurtz received an official termination letter from VT DOC, signed by Defendant Bovat. *See* Ex. A.

47. The sole reason provided for Mr. Kurtz's termination was the alleged violation of a work rule specifying that "[n]o employee shall violate any provision of the collective bargaining agreement or State or Department work rule, policy, procedure, directive, local work rule or post order." *See id.*

48. Specifically, the Termination Letter indicated that the relevant violation was Mr. Kurtz's "failure to comply with VT DOC Policy #26.01 Media Access as seen in [his] book *Sketches From Behind Prison Walls*." *See id.*

49. Over his more than three years as a VT DOC volunteer, Mr. Kurtz was never informed of or bound by Policy #26.01 on Media Access ("Media Access Directive" or the "Directive"). A true and correct copy of the Media Access Directive is attached as **Exhibit H**.

50. The Media Access Directive provides in pertinent part: "The purpose of this administrative directive is to establish guidelines in how the Vermont Department of Corrections relates to *media organizations* and in responding to requests for information and requests to *interview*, *photograph*, or *video record* inmates, staff, and correctional facilities." *See id.* (emphasis added).

51. Indeed, because the Media Access Directive applies to members of the media—not volunteers—it would not have made sense for VT DOC to provide Mr. Kurtz with this policy or bind him to it. *See id.*

52. Since his termination, Mr. Kurtz has been unable to serve the incarcerated men at SSCF through his Quaker ministry, an experience that he had described to his supervisor as "one of the most rewarding of [his] life."

11

53. Mr. Kurtz, by and through his attorneys, sent a letter ("Demand Letter") to Emily Carr, VT DOC's General Counsel, and Defendant Bovat on December 30, 2024. The letter was also sent via FedEx to Defendant Bovat on January 2, 2025.

54. The Demand Letter requested Mr. Kurtz's reinstatement as a Quaker volunteer and noted that his termination constituted retaliatory conduct in violation of his First Amendment rights. A true and correct copy of the Demand Letter is attached as **Exhibit I**.

55. On January 14, 2025, after receiving no reply for two weeks, Mr. Kurtz's attorneys reached out once again to Ms. Carr regarding the Demand Letter.

56. On January 15, 2025, Ms. Carr responded to the Demand Letter. The body of the response read—in its entirety—"I've received your correspondence, but VTDOC is not inclined to respond at this time." A true and correct copy of the emails between Mr. Kurtz's attorneys and Ms. Carr is attached as **Exhibit J**.

57. Because VT DOC refused to engage in any sort of discussion to resolve this issue without the need for litigation, Mr. Kurtz brings this suit.

## COUNTS

### COUNT I: VIOLATION OF FREE SPEECH GUARANTEE OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION UNDER 42 U.S.C. § 1983

58. Mr. Kurtz repeats the allegations set forth above in paragraphs 1-57 as if fully set forth herein.

59. Mr. Kurtz's work on *Sketches* is protected speech under the First Amendment.

60. Mr. Kurtz's work on *Sketches* constitutes speech on a matter of public concern.

61. Mr. Kurtz's work on *Sketches* constitutes speech not made in his official capacity as a volunteer with VT DOC.

62. Mr. Kurtz's interest in commenting upon matters of public concern through his work on *Sketches* outweighs Defendants' interests—if any—in promoting the efficiency of the public services it performs through its employees.

63. Defendants took adverse employment action against Mr. Kurtz when they terminated his position at SSCF.

64. Defendants retaliated against Mr. Kurtz because of his participation in helping to publish *Sketches*. The book includes statements that critique mass incarceration, the American criminal legal system, and, both implicitly and explicitly, VT DOC.

65. Mr. Kurtz's First Amendment-protected speech was the cause for his termination.

66. As such, Defendants' termination of Mr. Kurtz violates his First Amendment rights. Mr. Kurtz's constitutional injuries are ongoing.

67. Mr. Kurtz thus seeks declaratory and injunctive relief from Defendants' retaliatory and unconstitutional conduct.

### COUNT II: VIOLATION OF FREE SPEECH GUARANTEE OF CHAPTER I, ARTICLE 13 OF THE VERMONT CONSTITUTION

68. Mr. Kurtz repeats the allegations set forth in paragraphs 1-57 above as if fully set forth herein.

69. Mr. Kurtz's work related to *Sketches* is protected speech under Chapter I, Article 13 of the Vermont Constitution.

70. The Vermont Constitution safeguards the people's right to write and publish their views concerning the transactions of government without restraint.

71. Mr. Kurtz's work related to *Sketches* constitutes speech concerning the transactions of government, specifically the administration of prisons in Vermont and the experiences of incarcerated men at SSCF.

72. Mr. Kurtz's interest in speaking on these issues outweighs Defendants' interests in their official capacity, along with SSCF's and VT DOC's interests—if any—in promoting the efficiency of the public services it performs through its employees.

73. By terminating Mr. Kurtz from his volunteer position at SSCF, Defendants retaliated against Mr. Kurtz for his protected publication of sentiments concerning the operations of Vermont government.

74. As such, Defendants' termination of Mr. Kurtz's volunteer position at SSCF violates Chapter I, Article 13 of the Vermont Constitution has injured and continues to injure Mr. Kurtz.

75. Plaintiff thus seeks declaratory and injunctive relief from Defendants' retaliatory conduct.

### COUNT III: VIOLATION OF FREE EXERCISE GUARANTEE OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION UNDER 42 U.S.C. § 1983

76. Plaintiff repeats the allegations set forth above in paragraphs 1-57 as if fully set forth herein.

77. VT DOC's retaliation against Mr. Kurtz infringes upon his sincerely held religious beliefs in violation of the Free Exercise Clause of the First Amendment to the U.S. Constitution.

78. Mr. Kurtz's work on *Sketches* constitutes a form of religious practice, as speaking out against what he views as injustice, the indignity of incarceration, and promoting restorative justice after committing wrongdoing is an essential aspect of Quaker worship.

79. Further, Mr. Kurtz's Quaker ministry work at SSCF constitutes a form of religious practice, as gathering with others—especially those with differing life experiences—is an essential aspect of Quaker worship.

80.     By firing Mr. Kurtz, Defendants punished Mr. Kurtz for practicing his religion through his written expression of solidarity with incarcerated men at SSCF and his critique of prison conditions and mass incarceration more generally.

81.     Mr. Kurtz can show that Defendants had no real, non-pretextual reason to restrict his religious exercise.

82.     Neither were Defendants' actions justified by a legitimate penological interest, as evidenced by the fact that Defendants were aware of Mr. Kurtz work on *Sketches*, including its content, and he was only terminated after the book's publication.

83.     Suppressing religious exercise is not a legitimate penological interest.

84.     Under the Free Exercise Clause, it is unlawful for the government to penalize individuals because they disagree with their religious views. Defendants' disagreement with Mr. Kurtz's religious objections to mass incarceration, the criminal legal system, and the treatment of SSCF prisoners by society and the government cannot constitute lawful grounds for his firing.

85.     Because Defendants have punished Mr. Kurtz for professing, through *Sketches*, his religious beliefs, Defendants have retaliated against Mr. Kurtz in violation of the Free Exercise Clause of the First Amendment of the U.S. Constitution.

86.     Mr. Kurtz thus seeks declaratory and injunctive relief from Defendants' unconstitutional firing.

### COUNT IV: RELIGIOUS RETALIATION IN VIOLATION OF CHAPTER I, ARTICLE 3 OF THE VERMONT CONSTITUTION

87.     Plaintiff repeats the allegations set forth above in paragraphs 1-57 as if fully set forth herein.

88.     VT DOC's retaliation against Mr. Kurtz infringes upon Mr. Kurtz's religious exercise in violation of Chapter I, Article 3 of the Vermont Constitution.

89. The Vermont Constitution forbids the government from placing unreasonable burdens on individual exercises of religion, including by government retaliation.

90. Mr. Kurtz's work on *Sketches* constitutes a form of religious practice, as Quakerism involves, historically and contemporarily, giving voice to those most marginalized in society and standing against injustice in many contexts, including the American criminal legal system.

91. Because Defendants terminated Mr. Kurtz from his position at SSCF in retaliation for his work on *Sketches*, he was and continues to be punished for practicing Quakerism in violation of Chapter I, Article 3 of the Vermont Constitution.

92. Mr. Kurtz thus seeks declaratory relief from Defendants' retaliatory conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for the following relief:

A. Declare that the actions of Defendants and the VT DOC complained of herein violated Mr. Kurtz's rights under the First Amendment to the United States Constitution and Chapter I, Articles 3 & 13 of the Vermont Constitution;

B. Order Defendants to reinstate Mr. Kurtz's volunteer position at SSCF;

C. Award Mr. Kurtz his costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. §1988; and

E. Grant any and all further relief that this Court may deem just and proper.

Respectfully submitted this 20th day of August, 2025.

CORNELL LAW SCHOOL
FIRST AMENDMENT CLINIC[1]

By: _/s/ Jared Carter_
Jared Carter
Heather E. Murray (*pro hac vice* forthcoming)
Daniela del Rosario Wertheimer (*pro hac vice* forthcoming)
Myron Taylor Hall
Ithaca, New York 14853
Tel: (607) 255-8518
Email: jc2537@cornell.edu
Email: hem58@cornell.edu
Email: ddw83@cornell.edu

*Counsel for Plaintiff
Devon Kurtz*

---

[1] Clinic students Devin Brader-Araje, Zachary Jacobson, Gregory Jameson, and Jae Hyung "John" Seo drafted portions of this complaint. The First Amendment Clinic is housed within Cornell Law School and Cornell University in Ithaca, NY. Nothing in this complaint should be construed to represent the views of these institutions, if any.